# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BILL BRENGLE, SANDRA BROWN, GREGORY BYRGE, BRENDA DE JOURNETTE, MYRA JEAN GILDER, JACYLN S. KIZZIRE, CHRISTOPHER MCELROY, WILLIAM BARI, GABRIEL CARRION, LINDA G. HUDSON, RONALD LEE HUDSON, PONCE McELROY, GLENN PARADAY, MARVIN KEITH MYLES, JEFF RANKIN, JEFFREY BARTALO, ADAM COTE, SEDRICK YATES, SARAH M. CLAUNCH, ROLAND RENDON, JOHN TAYLOR, WILLIE TYRA, CRAIG WOOD, and DONNA WOOD on behalf of themselves and all others similarly situated, | **Case No.**  2:21-cv-1300 |
| | |
| | **CLASS ACTION COMPLAINT** |
| | |
| *Plaintiffs*, | |
| V. | |
| KONINKLIJKE PHILIPS N.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS RS NORTH AMERICA LLC, | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

Plaintiffs Bill Brengle, Sandra Brown, Gregory Byrge, Brenda de Journette, Myra Jean Gilder, Mary Jean Kizzire, Christopher McElroy, William Bari, Gabriel Carrion, Linda G. Hudson, Ronald Lee Hudson, Ponce McElroy, Glenn Paraday, Marvin Keith Myles, Jeff Rankin, Jeffrey Bartalo, Adam Cote, Sedrick Yates, Sarah M. Claunch, Roland Rendon, John Taylor, Willie Tyra, Craig Wood, and Donna Wood ("Plaintiffs"), on behalf of themselves, the class and respective subclasses of all others similarly situated as defined below, for their complaint against Defendants Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), and Philips RS North America LLC ("Philips RS") (collectively, Royal Philips, Philips

NA, and Philips RS are "Philips" or the "Defendants"), allege the following based on (a) personal knowledge, as to themselves, (b) the investigation of counsel, and (c) information and belief.

## **INTRODUCTION**

1.      Plaintiffs bring this action on behalf of themselves and a proposed class of purchasers and users of Continuous Positive Airway Pressure (CPAP), Bi-Level Positive Airway Pressure (Bi-Level PAP) devices and Mechanical Ventilators Devices manufactured by Philips, which contain polyester-based polyurethane sound abatement foam ("PE-PUR Foam").

2.      On April 26, 2021, Philips made a public announcement disclosing it had determined there were risks that the PE-PUR Foam used in certain CPAP, Bi-Level PAP, and Mechanical Ventilator Devices it manufactured may degrade or off-gas under certain circumstances.

3.      On June 14, 2021, Royal Philips issued a recall in the United States of its CPAP, Bi-Level PAP, and Mechanical Ventilator Devices containing PE-PUR Foam (collectively "Recalled Device" or Recalled Devices"), because Philips had determined that (a) the PE-PUR Foam was at risk for degradation into particles that may enter the devices' pathway and be ingested or inhaled by users, and (b) the PE-PUR Foam may off-gas certain chemicals during operation.[1] Philips further disclosed in its Recall Notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."[2]

---

[1] *See* Philips Recall Notice attached hereto as Exhibit "A."

[2] *Id.*

4.      Philips has disclosed that the absence of visible particles in the devices does not mean that PE-PUR Foam breakdown has not already begun. Philips reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").[3]

5.      Prior to issuing the Recall Notice, Philips received complaints regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask). Philips also received reports of headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices.

6.      In its Recall Notice, Philips disclosed that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects. The potential risks of chemical exposure due to off-gassing of PE-PUR Foam in these devices include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

7.      Philips recommended that patients using the recalled CPAP and Bi-Level PAP devices immediately discontinue using their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

8.      Plaintiffs each purchased or leased a Recalled Device, which Plaintiffs each used regularly at night through the Phillips Recall Notice.

---

[3] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

9.      On or about July 3, 2021, Plaintiffs learned that there was a recall of their Recalled Device due to the presence of a dangerous PE-PUR Foam that could cause them to suffer from adverse health effects, including, *inter alia*, cancer and organ failure.

10.      Plaintiffs seek to recover damages based on, *inter alia*, Philips' breach of express warranty, breach of implied warranties, misrepresentations, omissions, and breaches of state consumer protection laws in connection with its manufacture, marketing and sales of devices containing PE-PUR Foam on behalf of themselves and the proposed Class and Subclasses. In addition, Plaintiffs seek medical monitoring damages for users of Philips' devices identified in the Recall Notice, who are at risk of suffering from serious injury, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects.

## PARTIES

### A.      Plaintiffs

11.      Plaintiffs Bill Brengle ("Brengle"), Sandra Brown ("Brown"), Gregory Byrge ("Byrge"), Brenda de Journette ("de Journette"), Myra Jean Gilder ("Gilder"), Jacyln S. Kizzire ("Kizzire"), and Christopher McElroy ("C. McElroy") are each citizens of the State of Alabama.

12.      Plaintiffs William Bari ("Bari"), Gabriel Carrion ("Carrion"), Linda G. Hudson ("L. Hudson"), Ronald Lee Hudson ("R. Hudson"), Ponce McElroy ("P. McElroy"), and Glenn Paraday ("Paraday") are each citizens of the State of Florida.

13.      Plaintiffs Marvin Keith Myles ("Myles") and Jeff Rankin ("Rankin") are each citizens of the State of Mississippi.

14.      Plaintiff Jeffrey Bartalo ("Bartalo") is a citizen of the State of North Carolina.

15. Plaintiffs Adam Cote ("Cote") and Sedrick Yates ("Yates") are each citizens of the State of Tennessee.

16. Plaintiffs Sarah M. Claunch ("Claunch"), Roland Rendon ("Rendon"), John Taylor ("Taylor"), Willie Tyra ("Tyra"), Craig Wood ("C. Wood"), and Donna Wood ("D. Wood") are each citizens of the State of Texas.

### B.    Defendants

17. Defendant Royal Philips is a Dutch multinational corporation with its principal place of business located in Amsterdam, Netherlands. Royal Philips is the parent company of the Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries Philips NA and Philips RS.[4] Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.[5]

18. Defendant Philips NA is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly-owned subsidiary of Royal Philips.

19. Defendant Philips RS is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS is a wholly-owned

---

[4] Philips 2020 annual filing with the SEC, fn. 8, https://www.sec.gov/Archives/edgar/data/313216/000031321621000008/phg-exhibit8.htm (accessed June 30, 2021).

[5] Philips 2020 annual filing with the SEC, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg-20201231.htm (accessed June 30, 2021).

subsidiary of Royal Philips. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[6]

## JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class and Subclasses who are diverse from Defendants, and (4) there are more than 100 class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

21.    Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Defendants transact business in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and because the Defendants caused harm to class members residing in this District.

22.    The Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in this District, and the events giving rise to Plaintiffs' claims arise out of and relate to Defendants' contacts with this District. Moreover, Defendant Philips RS has its principal place of business in the forum State. Defendants Philips RS and Philips NA are controlled by their parent Royal Philips. Defendants' affiliations with this District are so continuous and systematic as to render them essentially at home in the forum State. Further, Defendants have transacted business, maintained substantial contacts, purposefully targeted

---

[6] Philips announces completion of tender offer to acquire Respironics, WEB WIRE, https://www.webwire.com/ViewPressRel.asp?aId=61199 (accessed June 27, 2021).

consumers and medical professionals for sales of its devices and/or committed overt acts in furtherance of the unlawful acts alleged in this Complaint in this District, as well as throughout the United States. The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

## FACTUAL BACKGROUND

### A.    Continuous Positive Airway Pressure Therapy

23.    Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea. CPAP therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help individuals breathe.

24.    Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health. CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

### B.     Bi-Level Positive Airway Pressure Therapy

25.     Bi-Level Positive Airway Pressure ("BiPAP") therapy is a common alternative to CPAP therapy for treating sleep apnea. Similar to CPAP therapy, BiPAP therapy is nonsurgical and involves the use of a nasal or facemask device to maintain air pressure in an individual's airway. BiPAP therapy is distinguishable from CPAP therapy, however, because Bi-Level PAP devices deliver two alternating levels—inspiratory and expiratory—of pressurized air into a person's airway, rather than the single continuous level of pressurized air delivered by a CPAP device. The inspiratory positive airway pressure assists a person as a breath is taken in. Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably breathe out. Bi-Level PAP devices deliver one level of pressurize air (the inspiratory positive level) to assist as a person inhales, and another level (the expiratory level) as a person exhales.

### C.     Mechanical Ventilation

26.     Mechanical ventilation is a treatment to help a person breathe when they find it difficult or are unable to breathe on their own. A Mechanical Ventilator Device pushes airflow into the patient's lungs to help them breathe. Mechanical ventilation may be invasive ventilation with a tube inserted into the patient's airway, performed in the intensive care unit in the hospital or a long-term institutional setting. Non-invasive ventilation can be used at home by people with respiratory difficulties.

## SUBSTANTIVE ALLEGATIONS

27.     Philips developed, marketed, and sold a variety of CPAP and Bi-Level PAP respirator devices and Mechanical Ventilator Devices under its "Sleep & Respiratory Care" segment of its business designed to assist individuals with a number of sleep, breathing, and respiratory conditions, including obstructive sleep apnea, central sleep apnea, complex sleep

apnea syndrome, and Chronic Obstructive Pulmonary Disease (COPD), as well as to assist those individuals requiring invasive and non-invasive ventilators for acute and sub-acute hospital environments. Philips' CPAP and Bi-Level PAP respirator devices and its Mechanical Ventilator Devices typically cost several hundred, if not thousands of dollars. Philips has sold millions of these devices in the United States.

### A.     Philips Sleep & Respiratory Care Devices Endangered Users

28.     On April 26, 2021, in its Quarterly Report for Q1 2021, Philips disclosed for the first time, under a section entitled "Regulatory Update," that device user reports had led to a discovery that the type of PE-PUR Foam Philips used to minimize noise in several CPAP and Bi-Level PAP respirators and mechanical ventilators posed health risks to its users. Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone[], and certain environmental conditions involving high humidity and temperature."[7]

29.     Seven weeks later, on June 14, 2021, Philips announced a recall of numerous models of CPAP and Bi-Level PAP devices, as well as a variety of its Mechanical Ventilator Devices "to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices."[8] Specifically, Philip announced that it had determined that the "PE-PUR foam may degrade into particles which may enter the

---

[7] First Quarter Results, PHILIPS (Apr. 26, 2021), https://www.results.philips.com/publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf (accessed June 27, 2021).

[8] *Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14, 2021), https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 27, 2021).

device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals."[9] In total, Philips announced that "[b]etween 3 million and 4 million" devices are targeted in the recall.[10]

30.     The list of the devices recalled by Philips (the "Recalled Devices") include:

| Philips CPAP and Bi-Level PAP Devices Manufactured Before April 26, 2021 Subject to Recall[11] ||
| --- | --- |
| **Device Name/Model Type** | **Type** |
| E30 (Emergency Use Authorization) | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| DreamStation ST, AVAPS | |
| SystemOne ASV4 | |
| C Series ASV | |
| C Series S/T and AVAPS | |
| OmniLab Advanced Plus | |
| SystemOne (Q Series) | Non-continuous Ventilator |
| DreamStation | |
| DreamStation GO | |
| Dorma 400 | |
| Dorma 500 | |
| REMStar SE Auto | |

---

[9] *Id.*

[10] Associated Press, *Philips recalls ventilators, sleep apnea machines due to health risks*, NBC NEWS, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (accessed June 27, 2021).

[11] Recall Notice (Exhibit "A" hereto); *see also* Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 27, 2021); Royal Philips Update on the recall notification, https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 27, 2021).

| Philips Mechanical Respirator Devices Manufactured Before April 26, 2021 Subject to Recall[12] | |
| --- | --- |
| **Device Name/Model Type** | **Type** |
| Trilogy 100 Ventilator | Continuous Ventilator |
| Trilogy 200 Ventilator | |
| Garbin Plus, Aeris, LifeVentVentilator | |
| A-Series BiPAP Hybrid A30 | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips A-Series BiPAP V30 Auto | |
| Philips A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |
| Philips A-Series BiPAP A30 | |

31. According to Philips, the PE-PUR Foam used in Recalled Devices puts users at risk of suffering from: "[i]rritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g. kidneys and liver) and toxic carcinogenic affects."[13]

32. Philips reported to physicians that PE-PUR Foam particles "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve."[14]

33. Further, Philips reported that "based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment."[15]

---

[12] *Id.*

[13] *Id.*

[14] Philips *Sleep and Respiratory Care Update – Clinical information for physicians*, June 14, 2021, philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

[15] *Id.*

34.     Philips announced that it has received reports of specific complaints from users of Recalled Devices who suffered from "headache[s], upper airway irritation, cough, chest pressure and sinus infection."[16]

**B.     The Health Risks Associated with Use of the Recalled Devices Renders Them Worthless**

35.     As a result of the health risks associated with the use of the Recalled Devices, together with Defendants' concealment of these risks from the date they were first reported to Defendants or discovered by Defendants through April 26, 2021, the Recalled Devices have been rendered completely worthless or, at the very least, have been substantially diminished in value.

36.     The information described above, including the now-known health risks of Philips CPAP devices, Bi-Level PAP devices and Mechanical Ventilator Devices, the recall, and the medical warnings and advice issued by Philips, have rendered the Recalled Devices worthless to patients with sleep apnea and respiratory conditions. Individuals not using life-supporting ventilators must immediately discontinue their user of the Recalled Devices or face serious health risks as grave as organ failure or cancer. If they choose to discontinue use of the Recalled Devices, they must pay for another expensive device in order to receive effective treatment for their sleep apnea and/or respiratory conditions. Individuals using life-supporting ventilators must seek an alternative treatment before discontinuing use of the Recalled Devices.

37.     Recognizing this, Philips issued the following advice to patients using any of the Recalled Devices:

---

[16] Recall Notice (Exhibit "A" hereto).

- "**For patients using BiLevel PAP and CPAP devices:** Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."[17]

- "**For patients using life-sustaining mechanical ventilator devices: DO NOT discontinue or alter prescribed therapy, without consulting physicians to determine appropriate next steps.**"[18]

38.     As a result of the above, Plaintiffs and the Class and Subclasses will have to undertake considerable expense replacing the Recalled Devices.

**C.**     **Philips Unreasonably Delayed its Recall**

39.     At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose to purchasers or users of the Recalled Devices that the PE-PUR Foam contained therein may off-gas or degrade upon use. Similarly, prior to the Update, Philips did not disclose any health risks associated with use of the Recalled Devices.

40.     Defendants have not disclosed when they first discovered or received reports from users of their Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."[19]

41.     At a minimum, as a result of user reports, Defendants were aware of the off-gassing and degradation of the PE-PUR Foam used in the Recalled Devices at some point prior to the recall, yet continued to manufacture and sell the Recalled Devices with such awareness. During this period, Defendants unreasonably and unjustly profited from the manufacture and sale

---

[17] Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 27, 2021) (Questions and answers) (emphasis in original).

[18] *Id.*

[19] Recall Notice (Exhibit "A" hereto).

of the Recalled Devices and unreasonably put users of the Recalled Devices at risk of development of serious adverse health effects, including organ failure and cancer.

D.    **Plaintiffs**

**Alabama Plaintiffs**

42.    Plaintiff Brengle is a citizen and resident of the State of Alabama.

43.    Plaintiff Brengle owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

44.    Plaintiff Brengle overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with its use.

45.    As a result of the health risks associated with the use of the Recalled Device, Plaintiff Brengle's Recalled Device is worthless.

46.    Plaintiff Brown is a citizen and resident of the State of Alabama.

47.    Plaintiff Brown owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

48.    Plaintiff Brown overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with its use.

49.    As a result of the health risks associated with the use of the Recalled Device, Plaintiff Brown's Recalled Device is worthless.

50.    Plaintiff Byrge is a citizen and resident of the State of Alabama.

51.    Plaintiff Byrge owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

52.    Plaintiff Byrge overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with its use.

14

53.     As a result of the health risks associated with the use of the Recalled Device, Plaintiff Byrge's Recalled Device is worthless.

54.     Plaintiff de Journette is a citizen and resident of the State of Alabama.

55.     Plaintiff de Journette owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

56.     Plaintiff de Journette overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with its use.

57.     As a result of the health risks associated with the use of the Recalled Device, Plaintiff de Journette's Recalled Device is worthless.

58.     Plaintiff Gilder is a citizen and resident of the State of Alabama.

59.     Plaintiff Gilder owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

60.     Plaintiff Gilder overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with its use.

61.     As a result of the health risks associated with the use of the Recalled Device, Plaintiff Gilder's Recalled Device is worthless.

62.     Plaintiff Kizzire is a citizen and resident of the State of Alabama.

63.     Plaintiff Kizzire owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

64.     Plaintiff Kizzire overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with its use.

65.     As a result of the health risks associated with the use of the Recalled Device, Plaintiff Kizzire's Recalled Device is worthless.

66.    Plaintiff C. McElroy is a citizen and resident of the State of Alabama.

67.    Plaintiff C. McElroy owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

68.    Plaintiff C. McElroy overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with its use.

69.    As a result of the health risks associated with the use of the Recalled Device, Plaintiff C. McElroy's Recalled Device is worthless.

**Florida Plaintiffs**

70.    Plaintiff Bari is a citizen and resident of the State of Florida.

71.    Plaintiff Bari owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

72.    Plaintiff Bari overpaid for a Recalled Device when it was purchased or leased without knowledge of the health risks associated with the use of Recalled Devices.

73.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff Bari's Recalled Device is worthless.

74.    Plaintiff Carrion is a citizen and resident of the state of Florida.

75.    Plaintiff Carrion owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

76.    Plaintiff Carrion overpaid for a Recalled Devices when it was purchased or leased without knowledge of the health risks associated with the use of Recalled Devices.

77.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff Carrion's Recalled Device is worthless.

78.    Plaintiff L. Hudson is a citizen and resident of the state of Florida.

16

79.     Plaintiff L. Hudson owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

80.     Plaintiff L. Hudson overpaid for a Recalled Devices when it was purchased or leased without knowledge of the health risks associated with the use of Recalled Devices.

81.     As a result of the health risks associated with the use of Recalled Devices, Plaintiff L. Hudson's Recalled Device is worthless.

82.     Plaintiff R. Hudson is a citizen and resident of the state of Florida.

83.     Plaintiff R. Hudson owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

84.     Plaintiff R. Hudson overpaid for a Recalled Devices when it was purchased or leased without knowledge of the health risks associated with the use of Recalled Devices.

85.     As a result of the health risks associated with the use of Recalled Devices, Plaintiff R. Hudson's Recalled Device is worthless.

86.     Plaintiff P. McElroy is a citizen and resident of the State of Florida.

87.     Plaintiff P. McElroy owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

88.     Plaintiff P. McElroy overpaid for a Recalled Device when it was purchased or leased without knowledge of the health risks associated with the use of Recalled Devices.

89.     As a result of the health risks associated with the use of Recalled Devices, Plaintiff P. McElroy's Recalled Device is worthless.

90.     Plaintiff Paraday is a citizen and resident of the state of Florida.

91.     Plaintiff Paraday owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

92.     Plaintiff Paraday overpaid for a Recalled Devices when it was purchased or leased without knowledge of the health risks associated with the use of Recalled Devices.

93.     As a result of the health risks associated with the use of Recalled Devices, Plaintiff Paraday's Recalled Device is worthless.

**Mississippi Plaintiffs**

94.     Plaintiff Myles is a citizen and resident of the State of Mississippi.

95.     Plaintiff Myles owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

96.     Plaintiff Myles overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

97.     As a result of the health risks associated with the use of Recalled Devices, Plaintiff Myles's Recalled Device is worthless.

98.     Plaintiff Rankin is a citizen and resident of the State of Mississippi.

99.     Plaintiff Rankin owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

100.    Plaintiff Rankin overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

101.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff Rankin's Recalled Device is worthless.

**North Carolina Plaintiff**

102.    Plaintiff Bartalo is a citizen and resident of the State of North Carolina.

103.    Plaintiff Bartalo owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

104.    Plaintiff Bartalo overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

105.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff Bartalo's Recalled Device is worthless.

**Tennessee Plaintiffs**

106.    Plaintiff Cote is a citizen and resident of the State of Tennessee.

107.    Plaintiff Cote owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

108.    Plaintiff Cote overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

109.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff Cote's Recalled Device is worthless.

110.    Plaintiff Yates is a citizen and resident of the State of Tennessee.

111.    Plaintiff Yates owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

112.    Plaintiff Yates overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

113.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff Yates's Recalled Device is worthless.

**Texas Plaintiffs**

114.    Plaintiff Claunch is a citizen and resident of Texas.

115.    Plaintiff Claunch owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

116.    Plaintiff Claunch overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

117.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff Claunch's Recalled Device is worthless.

118.    Plaintiff Rendon is a citizen and resident of Texas.

119.    Plaintiff Rendon owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

120.    Plaintiff Rendon overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

121.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff Rendon's Recalled Device is worthless.

122.    Plaintiff Taylor is a citizen and resident of Texas.

123.    Plaintiff Taylor owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

124.    Plaintiff Taylor overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

125.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff Taylor's Recalled Device is worthless.

126.    Plaintiff Tyra is a citizen and resident of Texas.

127.    Plaintiff Tyra owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

128.    Plaintiff Tyra overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

129.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff Tyra's Recalled Device is worthless.

130.    Plaintiff C. Wood is a citizen and resident of Texas.

131.    Plaintiff C. Wood owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

132.    Plaintiff C. Wood overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

133.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff C. Wood's Recalled Device is worthless.

134.    Plaintiff D. Wood is a citizen and resident of Texas.

135.    Plaintiff D. Wood owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

136.    Plaintiff D. Wood overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risks associated with the use of Recalled Devices.

137.    As a result of the health risks associated with the use of Recalled Devices, Plaintiff D. Wood's Recalled Device is worthless.

## TOLLING AND ESTOPPEL

### A.    DISCOVERY RULE TOLLING

138.    Plaintiffs and the members of the Nationwide Class and State Subclasses had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices.

139.    Neither Plaintiffs nor any other members of the Nationwide Class and State Subclasses, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein. Further, Plaintiffs and members of the Nationwide Class and State Subclasses did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

140.    For these, reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs, the Nationwide Class and State Subclasses.

## B.    FRAUDULENT CONCEALMENT TOLLING

141.    By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiffs and the members of the Nationwide Class and State Subclasses.

142.    Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiffs and members of the Nationwide Class and State Subclasses. Plaintiffs and the members of the Class and Subclasses were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Nationwide Class and State Subclasses should be tolled.

## CLASS ACTION ALLEGATIONS

143.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). Plaintiffs seek class certification on behalf of a class defined as follows (the "Class"):

22

> **NATIONWIDE CLASS**: All persons in the United States who purchased, leased, or used a CPAP, Bi-Level PAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021.

144.    Plaintiffs seek certification on behalf of subclasses defined as more fully set forth below and collectively referred to as "State Subclasses."

145.    Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy seek certification on behalf of a subclass defined as follows ("Alabama Subclass"):

> **ALABAMA SUBCLASS:**  All persons who were or are citizens of the State of Alabama who purchased, leased, or used a CPAP, Bi-Level PAP, or Mechanical Ventilator Device that was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

146.    Plaintiffs Bari, Carrion, L. Hudson, R. Hudson, P. McElroy, and Paraday seek certification on behalf of a subclass defined as follows ("Florida Subclass");

> **FLORIDA SUBCLASS:**  All persons who were or are citizens of the State of Florida who purchased, leased, or used CPAP, Bi-Level PAP, or Mechanical Ventilator Device was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

147.    Plaintiffs Myles and Rankin seek certification on behalf of a subclass defined as follows ("Mississippi Subclass");

> **MISSISSIPPI SUBCLASS:** All persons who were or are citizens of the State of Mississippi who purchased, leased or used CPAP, Bi-Level PAP, or Mechanical Ventilator Device was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

148.    Plaintiff Bartalo seeks certification on behalf of a subclass defined as follows ("North Carolina Subclass");

> **NORTH CAROLINA SUBCLASS:** All persons who were or are citizens of the State of North Carolina who purchased, leased or used CPAP, Bi-Level PAP, or Mechanical Ventilator Device was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

149.    Plaintiffs Cote and Yates seek certification on behalf of a subclass defined as follows ("Tennessee Subclass");

> **TENNESSEE SUBCLASS:** All persons who were or are citizens of the State of Tennessee who purchased, leased, or used CPAP, Bi-Level PAP, or Mechanical Ventilator Device was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

150.    Plaintiffs Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood seek certification on behalf of a subclass defined as follows ("Texas Subclass");

> **TEXAS SUBCLASS:** All persons who were or are citizens of the State of Texas who purchased, leased, or used CPAP, Bi-Level PAP, or Mechanical Ventilator Device was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

151.    Plaintiffs reserve the right to modify or refine the definitions of the Class or Subclasses based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

152.    Excluded from the Nationwide Class and State Subclasses are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Nationwide Class and State Subclasses; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

153.    **Numerosity (Rule 23(a)(1))**. The Nationwide Class and State Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of

members of the Nationwide Class and State Subclasses, as herein identified and described, is not known, but sales figures and the Recall Notice indicate that millions of individuals have purchased or leased the Recalled Devices.

154.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Nationwide Class and State Subclasses members, including the following:

- whether Defendants owed a duty of care to Plaintiffs and the Nationwide Class and State Subclasses;

- whether Defendants knew or should have known that the PE-PUR Foam used for sound abatement posed health risks;

- whether Defendants wrongfully represented that the PE-PUR Foam used for sound abatement in the Recalled Devices was safe;

- whether the Recalled Devices retained any value post-recall;

- whether Defendants wrongfully represented that the Recalled Devices were safe to use;

- whether Defendants wrongfully failed to disclose that the PE-PUR Foam used for sound abatement in the Recalled Devices posed health risks to Recalled Device users;

- whether Defendants' representations and omissions in advertising, warranties, packaging, and/or labeling were false, deceptive, and/or misleading;

- whether those representations and omissions were likely to deceive a reasonable consumer;

- whether a reasonable consumer would consider the presence, or risk of, health risks as a material fact in purchasing one of the Recalled Devices;

- whether Defendants had knowledge that those representations and omissions were false, deceptive, and misleading;

- whether Defendants breached their express warranties;

- whether Defendants breached their implied warranties;

- whether Defendants engaged in unfair trade practices;

- whether Defendants engaged in false advertising;

- whether Defendants' conduct was negligent per se;

- whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions; and

- whether Plaintiffs and the members of the Nationwide Class and State Subclasses are entitled to actual, statutory, and punitive damages.

155. **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Nationwide Class and State Subclasses. Plaintiffs and members of the Nationwide Class and State Subclasses (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Nationwide Class and State Subclasses.

156. **Adequacy (Rule 23(a)(4))**. Plaintiffs' interests are aligned with the Nationwide Class and respective State Subclasses they seek to represent. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Nationwide Class and State Subclasses. Plaintiffs have retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interests of the Nationwide Class and State Subclasses. Plaintiffs

have no interest that is antagonistic to those of the Class and Subclasses, and Defendants have no

defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously

prosecuting this action on behalf of the members of the Class and Subclasses. Neither Plaintiffs

nor Plaintiffs' counsel have any interest adverse to those of the other members of the Nationwide

Class and State Subclasses.

157.    **Superiority**. This class action is appropriate for certification because class

proceedings are superior to other available methods for the fair and efficient adjudication of this

controversy, and joinder of all members of the Nationwide Class and State Subclasses is

impracticable. The prosecution of separate actions by individual members of the Nationwide

Class and State Subclasses would impose heavy burdens upon the Courts and Defendants, would

create a risk of inconsistent or varying adjudications of the questions of law and fact common to

members of the Nationwide Class and State Subclasses, and would be dispositive of the interests

of the other members not parties to the individual adjudications or would substantially impair or

impede their ability to protect their interests. Class treatment will create economies of time,

effort, and expense and promote uniform decision-making.

158.    **Manageability.** This proposed class action presents fewer management

difficulties than individual litigation, and provides the benefits of single adjudication, economies

of scale, and comprehensive supervision by a single court.

159.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3)

because the above common questions of law or fact predominate over any questions affecting

individual members of the Class, and a class action is superior to other available methods for the

fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### BREACH OF EXPRESS WARRANTY
**(on behalf of the Nationwide Class or, alternatively, the State Subclasses)**

160.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

161.    Philips marketed and sold the Recalled Devices into the stream of commerce with the intent that the Recalled Devices would be purchased, leased, or used by Plaintiffs and the Nationwide Class and State Subclasses.

162.    Philips expressly warranted, advertised, and represented to Plaintiffs and the Nationwide Class and State Subclasses that the Recalled Devices were safe and appropriate for human use.

163.    Philips made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiffs and the Nationwide Class and State Subclasses entered into upon purchasing the Recalled Devices.

164.    Philips' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices, were made in connection with the sale of the Recalled Devices to Plaintiffs and the Nationwide Class and State Subclasses. Plaintiffs and the Nationwide Class and State Subclasses justifiably relied on Philips' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use Philips' Recalled Devices.

165.    Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

166.    Philips therefore breached its express warranties by placing Recalled Devices into the stream of commerce and selling them to consumers, when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

167.    Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiffs and members of the Nationwide Class and State Subclasses that they were at risk of developing adverse health effects as a result of the dangerous PE-PUR Foam used in the Recalled Devices.

168.    Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use. Philips thus utterly failed to ensure that the material representations they were making to consumers were true.

169.    The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiffs and members of the Nationwide Class and State Subclasses. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiffs and members of the Nationwide Class and State Subclasses at the time of purchase of the Recalled Devices.

170.    As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

171.    In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions to induce Plaintiffs and members of the Nationwide Class and State Subclasses to rely on such representations and omissions.

172.    Philips' affirmations of fact and promises and its omissions were material, and Plaintiffs and members of the Nationwide Class and State Subclasses reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

173.    All conditions precedent to Philips' liability for its breach of express warranty have been performed by Plaintiffs or members of the Nationwide Class and State Subclasses.

174.    Affording Philips an opportunity to cure its breaches of written warranties would be unnecessary and futile here. Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR Foam in the Recalled Devices was unsafe. Philips had ample opportunity either to stop using the PE-PUR Foam or to replace the PE-PUR Foam in the Recalled Devices to make them safe and healthy for use by Plaintiffs and members of the Nationwide Class and State Subclasses, but failed to do so until now.

175.    As a direct and proximate result of Philips' breaches of express warranty, Plaintiffs and members of the Nationwide Class and State Subclasses have been damaged because they did not receive the products as specifically warranted by Philips. Plaintiffs and members of the Nationwide Class and State Subclasses did not receive the benefit of the bargain

and suffered damages at the point of sale stemming from their overpayment for the Recalled Devices.

176.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

## SECOND CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (on behalf of the Nationwide Class or, alternatively, the State Subclasses)

177.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

178.    Philips are merchants engaging in the sale of goods to Plaintiffs and the Nationwide Class and State Subclasses.

179.    There was a sale of goods from Philips to Plaintiffs and the Nationwide Class and State Subclasses.

180.    At all times mentioned herein, Philips manufactured or supplied the Recalled Devices, and prior to the time the Recalled Devices were purchased, leased, or used by Plaintiffs and the Nationwide Class and State Subclasses, Philips impliedly warranted to them that the Recalled Devices were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact and omissions made on the Recalled Devices' labels and packaging, including that the Recalled Devices were safe and appropriate for human use. Plaintiffs and the Nationwide Class and State Subclasses relied on Philips' promises and affirmations of fact and omissions when they purchased, leased, and used the Recalled Devices.

181.    Contrary to these representations and warranties, the Recalled Devices were not fit for their ordinary use and did not conform to Philips' affirmations of fact and promises and

omissions because use of the Recalled Devices is accompanied by the risk of adverse health effects, which does not conform to the labels and packaging of these devices.

182.    Philips breached its implied warranties by selling Recalled Devices that failed to conform to the promises or affirmations of fact made on the packaging or label, as use of each Recalled Devices was accompanied by the risk of developing adverse health effects that do not conform to the packaging or label.

183.    Philips was on notice of this breach, as it was made aware of the adverse health effects accompanying use of the Recalled Devices through user reports submitted to Philips and through lab testing.

184.    Privity exists because Philips impliedly warranted to Plaintiffs and the Nationwide Class through the warranting, packaging, advertising, marketing, and labeling that the Recalled Devices were natural, and suitable for use to treat health conditions, and made no mention of the attendant health risks associated with use of the Recalled Devices.

185.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Nationwide Class and State Subclasses have suffered actual damages in that each Recalled Device they purchased or leased is worth less than the price they paid and which they would not have purchased or leased at all had they known of the attendant health risks associated with the use of each Recalled Device.

186.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their implied warranties and resulting breach.

### THIRD CLAIM FOR RELIEF

**FRAUDULENT MISREPRESENTATION**
**(on behalf of the Nationwide Class or, alternatively, the State Subclasses)**

187.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

188.    Philips failed to advise Plaintiffs and the Nationwide Class and State Subclasses that the Recalled Devices posed serious health risks to their users and Philips falsely represented to Plaintiffs and the Nationwide Class and State Subclasses that the Recalled Devices were safe for human use.

189.    Philips intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiffs and the Nationwide Class and State Subclasses to purchase the Recalled Devices.

190.    Philips knew that its representations and omissions about the Recalled Devices were false in that the Recalled Devices contained PE-PUR Foam and thus were at risk of causing adverse health effects to users of the Recalled Devices, which does not conform to the products' labels, packaging, advertising, and statements. Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Nationwide Class and State Subclasses.

191.    Plaintiffs and the Nationwide Class and State Subclasses did in fact rely on these omissions and misrepresentations and purchased, leased, and used the Recalled Devices to their detriment. Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Recalled Devices, Plaintiffs' and the Nationwide Class' and State Subclasses' reliance on Philips' omissions and misrepresentations was justifiable.

192.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Nationwide Class and State Subclasses have suffered actual damages in that they purchased the Recalled

Devices (a) that were worth less than the price they paid, (b) which they would not have purchased or leased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which did not conform to the Recalled Devices' labels, packaging, advertising, and statements.

193.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FOURTH CLAIM FOR RELIEF

### FRAUD BY OMISSION
### (on behalf of Nationwide Class or, alternatively, the State Subclasses)

194.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

195.    Philips concealed from and failed to disclose to Plaintiffs and the Nationwide Class and State Subclasses that use of Recalled Devices is accompanied by a risk of adverse health effects, which does not conform to the products' labels, packaging, advertising, and statements.

196.    Philips was under a duty to disclose to Plaintiffs and the Nationwide Class and State Subclasses the true quality, characteristics, ingredients and suitability of the Recalled Devices because: (a) Philips was in a superior position to know the true state of facts about its products; (b) Philips was in a superior position to know the risks associated with the use of, characteristics of, and suitability of the Recalled Devices for use by individuals; and (c) Philips knew that Plaintiffs and the Nationwide Class and State Subclasses could not reasonably have been expected to learn or discover prior to purchasing the Recalled Devices that there were misrepresentations and omissions by Philips in the packaging, labels, advertising, and websites regarding the health risks associated with use of these devices.

197.    The facts concealed or not disclosed by Philips to Plaintiffs and the Nationwide Class and State Subclasses were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Recalled Devices.

198.    Plaintiffs and the Nationwide Class and State Subclasses justifiably relied on Philips' omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associated with the use of the Recalled Devices, which is inferior when compared to how the Recalled Devices are advertised and represented by Philips.

199.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Nationwide Class and State Subclasses have suffered actual damages in that they purchased or leased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased or leased at all had they known of the health risks associated with the use of the Recalled Devices, and (c) which do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

200.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FIFTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION
**(on behalf of the Nationwide Class or, alternatively, the State Subclasses)**

201.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

202.    Philips had a duty to Plaintiffs and the Nationwide Class and State Subclasses to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of the Recalled Devices.

203.    Philips breached its duty to Plaintiffs and the Nationwide Class by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiffs and

the Class that did not have the qualities, characteristics, and suitability for use as advertised by Philips and by failing to promptly remove the Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices.

204.    Philips knew or should have known that the qualities and characteristics of the Recalled Devices were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Philips. Specifically, Philips knew or should have known that: (a) the use of the Recalled Devices was accompanied by risk of adverse health effects that do not conform to the packaging and labeling; (b) the Recalled Devices were adulterated, or at risk of being adulterated, by the PE-PUR Foam; and (c) the Recalled Devices were otherwise not as warranted and represented by Philips.

205.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Nationwide Class and State Subclasses have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased or leased at all had they known they contained PE-PUR Foam that could cause users of the Recalled Devices to suffer adverse health effects, and (c) which do not conform to the products' labels, packaging, advertising, and statements.

206.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
**(on behalf of the Nationwide Class or, alternatively, the State Subclasses)**

207.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

208.    Plaintiffs and the Nationwide Class and State Subclasses conferred substantial benefits on Philips through their purchase of the Recalled Devices. Philips knowingly and willingly accepted and enjoyed these benefits.

209.    Philips either knew or should have known that the payments rendered by Plaintiffs and the Nationwide Class and State Subclasses were given with the expectation that the Recalled Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips. As such, it would be inequitable for Philips to retain the benefit of the payments under these circumstances.

210.    Philips' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiffs and the Nationwide Class and State Subclasses.

211.    Plaintiffs and the Nationwide Class and State Subclasses are entitled to recover from Philips all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

212.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## SEVENTH CLAIM FOR RELIEF

**PENNSYLVANIA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION LAW, 73 Pa. Cons. Stat. Ann. §§ 201-1, *et seq.*
(on behalf of the Nationwide Class, or alternatively, the State Subclasses, except for Class
Members who purchased or leased a Recalled Device for business use only)**

213.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

214.    At all times mentioned herein, Philips engaged in "trade" or "commerce" in Pennsylvania, as defined by 73 Pa. Cons. Stat. Ann. § 201-2(3), in that they advertised, offered for sale, and sold goods, property, or services primarily for personal, family, or household

purposes, and advertised, solicited, offered for sale, and sold "services," "property," "article[s]," "commodity[ies]," or "thing[s] of value" in Pennsylvania.

215.     Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTCPL"), 73 Pa. Cons. Stat. Ann. § 201-3 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…are hereby declared unlawful."

216.     For the reasons discussed herein, Philips violated and continues to violate the UTCPL by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by UTCPL §§ 201-1, *et seq.* Philips' acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

217.     Philips repeatedly advertised on the labels and packing for the Recalled Devices, on Philips' websites, and through national advertising campaigns, among other items, that the Recalled Devices were safe and fit for human use. Philips failed to disclose the material information that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use.

218.     Philips' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase and use the Recalled Devices without being aware that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use. As a direct and proximate result of Philips' unfair and deceptive acts or practices, Plaintiffs, Nationwide Class members, and State Subclass members suffered damages by purchasing the Recalled Devices because they would not have purchased or leased the Recalled Devices had they known the truth, and they received a

product that was worthless because it contains unsafe PE-PUR Foam which can cause a number of adverse health effects, including organ failure and cancer.

219.    Philips' deceptive trade practices caused injury in fact and actual damages to Plaintiffs, Nationwide Class members, and State Subclass members in the form of the loss or diminishment of value of the Recalled Devices that Plaintiffs, Nationwide Class members, and State Subclass members purchased or leased, which allowed Defendants to profit at the expense of Plaintiffs, Nationwide Class members, and State Subclass members. The injuries Plaintiffs, Nationwide Class members, and State Subclass members sustained were to legally protected interests. The gravity of the harm of Philips' actions is significant and there is no corresponding benefit to consumers of such conduct.

220.    Plaintiffs, Nationwide Class members, and State Subclass members seek relief for the injuries they have suffered as a result of Defendants' unfair and deceptive acts and practices, as provided by 73 Pa. Cons. Stat. Ann. § 201-9.2 and applicable law.

## EIGHTH CLAIM FOR RELIEF

### MEDICAL MONITORING
**(on behalf of the State Subclasses, except for Class Members
who purchased or leased a Recalled Device for business use only)**

221.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

222.    At all relevant times, the Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed the Recalled Devices into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiffs.

223.    Defendants have reported that users of the Recalled Devices face risks of serious injury from the degradation of PE-PUR Foam contained in the Recalled Devices. Degradation of PE-PUR Foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments in certain regions, and cleaning methods such as ozone may accelerate potential degradation.

224.    When PE-PUR Foam degrades into particles that may enter the device's pathway and be ingested or inhaled by users of the devices, users face significantly increased risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of degraded foam exposure include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects.

225.    The off-gassing of chemicals from the PE-PUR Foam contained in the Recalled Devices poses risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of exposure to off-gassing from PE-PUR Foam include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

226.    The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun. Philips has reported that lab analysis of the degraded foam reveals the presence of harmful chemicals including: TDA, TDI, and DEG.[20] TDI is a powerful irritant to the mucous membranes of the eyes and gastrointestinal and respiratory tracts,[21] and has been

---

[20] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

[21] The National Institute for Occupational Safety and Health (NIOSH) Current Intelligence Bulletin 53, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, DHHS (NIOSH) Publication Number 90-101 (Dec. 1989); *see also* Gunnar Skarping, *et al.*, *Biological monitoring of*

reported to cause Occupational Asthma.[22] Exposure to TDA may result in ataxia, tachycardia, nausea, vomiting, convulsions, and respiratory depression.[23] TDA can cause chemical cyanosis (*i.e.*, bluish discoloration of the skin) by converting hemoglobin to methemoglobin. This compound can also cause fatty degeneration of the liver.[24] TDA and TDI are potential carcinogens.[25] Repeated exposure to DEG has been associated with damage to the kidneys and renal failure.[26]

227.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been exposed to substantially increased risks of serious injury from off-gassing and/or degradation of PE-PUR Foam in the Recalled Devices, which is beyond normal background levels of risk.

228.    As a direct and proximate result of Defendants' conduct, Plaintiffs have a significantly increased risk of suffering serious injury or contracting a serious latent disease, and

---

[22] *isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*, Dep't of Occupational and Environmental Medicine, University Hospital, S-221 85 Lund, Sweden (1990); https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.

[22] Bernstein, David I, *Occupational asthma: Definitions, epidemiology, causes, and risk factors*, Wolters Kluwer, UpToDate.com (accessed Jun. 30, 2021).

[23] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*; *see also* Skarping, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*; https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.

[24] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*.

[25] *Id.* ("The excess cancer risk for workers exposed to TDI and TDA has not yet been quantified, but the probability of developing cancer should be decreased by minimizing exposure.").

[26] Greg M. Landry, *Diethylene glycol-induced toxicities show marked threshold dose response in rats*, Toxicology and Applied Pharmacology 282 (2015) 244-251 ("DEG has recently been involved in several mass epidemics of renal failure and death world-wide (O'Brien et al., 1998; Schier et al., 2013). DEG poisoning clinically manifests in metabolic acidosis, hepatotoxicity, renal failure, and peripheral neuropathy, with the hallmark being acute renal failure involving proximal tubule cell necrosis and cortical degeneration (Schep et al., 2009)"); Cohen, Jeffrey A., *Demyelinating Diseases of the Peripheral Nerves*, Nerves and Nerve Injuries (2015) ("When consumed, DEG causes severe systemic and neurologic complications, including coma, seizures, peripheral neuropathy, and hepatorenal failure.").

suffering further injury at an unknown date in the future. Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

229.    Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR Foam possible. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

230.    Existing medical research indicates that exposure to TDI, TDA, and DEG, which Philips has found to exist in off-gassed or degraded PE-PUR Foam, can cause serious, life-threatening and permanent injuries. Philips has received reports from users of the Recalled Devices of headache, upper airway irritation, cough, chest pressure and sinus infection. The exposure to the defects inherent in the Recalled Devices has occurred for users, such as Plaintiffs, but the full extent of the injuries will not manifest until later in the Plaintiffs' life. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiffs be placed under period diagnostic testing beyond that normally recommended in the absence of use of the Recalled Devices.

231.    Plaintiffs demand judgment against Defendants for medical monitoring damages to diagnose injuries caused by the Recalled Devices at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CLAIM FOR RELIEF

**ALABAMA DECEPTIVE TRADE PRACTICES ACT—DECEPTION**
**Ala. Code §§ 8-19-1 *et seq*.**
**(On behalf of Plaintiffs Brengle, Brown, Byrge, de Journette,**
**Gilder, Kizzire, C. McElroy, and the Alabama Subclass)**

232.    Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy incorporate the foregoing allegations as if fully set forth herein.

233.    At all relevant times, Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and the members of the Alabama Subclass were natural people who purchased or leased Defendants' Recalled Devices detailed above for personal, family or household use and not for resale.

234.    At all relevant times, Defendants were either natural persons or corporations or some other legal entity.

235.    The Recalled Devices are "goods" as defined by the Alabama deceptive trade Practice Act. *See* Ala. Code § 8-19-3(3).

236.    At all relevant times, Defendants were engaged in Trade or Commerce as defined by the Alabama deceptive trade Practice Act. *See* Ala. Code § 8-19-3(8).

237.    The Alabama Deceptive Trade Practices Act declares that (1) passing off goods or services as those of another; (2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) causing confusion or misunderstanding as to the affiliation, connection, or association with, or certification by another, provided that this section shall not prohibit the private labeling of goods or services; (4) using deceptive representations or designations of geographic origin in connection with goods or services; (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship,

43

approval, status, affiliation, or connection that he or she does not have; (6) representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, secondhand, or altered to the point of decreasing their value or rendering the goods unfit for the ordinary purpose for which they were purchased or leased; (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (8) disparaging the goods, services, or business of another by false or misleading representation of fact; (9) advertising goods or services with intent not to sell them as advertised; (10) advertising goods or services with intent not to supply reasonably expectable public demand unless the advertisement discloses a limitation of quantity; (11) making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions; and (12) engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce; is unlawful. *See* Ala. Code § 8-19-5.

238.    The Alabama Deceptive Trade Practices Act further states that any person who commits one or more of the acts or practices declared unlawful under this chapter and thereby causes monetary damage to a consumer, shall be liable to each consumer for (1) any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or (2) up to three times any actual damages. *See* Ala. Code § 8-19-10.

239.    Defendants, by and through their employees, agents, and/or servants, and in connection with its advertising and sale of the Recalled Devices detailed above, knowingly engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above.

240.    Defendants knew that their statements were false or that their conduct was deceptive because they know about the degradation of the PE-PUR Foam used in the Recalled Devices.

241.    The facts Defendants misrepresented, concealed, suppressed or omitted as alleged above were material, are the type of information upon which a reasonable consumer is expected to rely in making a decision of whether to purchase Defendants' Recalled Devices.

242.    Defendants' misrepresentations, concealment, suppression and omission of material facts as alleged above creates a likelihood of deception and has the capacity to deceive a reasonable consumer.

243.    Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above with the intent that Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members would rely on those deceptive and unfair acts and practices and induce Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and the Class members to purchase Defendants' Recalled Devices.

244.    Because the characteristics of the Recalled Devices were not as represented, and those characteristics are material to a reasonable consumer of the Recalled Devices, the value of the Recalled Devices was less than the value the Recalled Devices would have had the Recalled Devices actually possessed the characteristics that were represented.

245.    Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members were deceived by Defendants' deceptive and unfair acts and practices in that had they known the truth they would not have purchased or leased Defendants' Recalled Devices.

246.     Instead, as a result of Defendants' misrepresentation, Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members suffered monetary losses in that (1) the actual value of the Recalled Devices they received was less than the value of the Recalled Devices as represented which denied them of the benefit of their bargain; and (2) Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members paid more than the fair market value of the Recalled Devices they received causing them out-of-pocket damages.

247.     Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members could not have avoided these injuries. Because Defendants were the sole source of material information that Defendants failed to disclose, Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members could not have had reason to anticipate the impending harm and thus avoided their injuries.

## TENTH CLAIM FOR RELIEF

**ALABAMA DECEPTIVE TRADE PRACTICES ACT—UNCONSCIONABILITY**
**Ala. Code §§ 8-19-1 *et seq.***
**(On behalf of Plaintiffs Brengle, Brown, Byrge, de Journette,**
**Gilder, Kizzire, C. McElroy, and the Alabama Subclass)**

248.     Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy incorporate the foregoing allegations as if fully set forth herein.

249.     Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy bring this claim individually and on behalf of the members of the Alabama Subclass.

250.     This claim is brought in the alternative to any common law claim for fraud, misrepresentation, deceit, suppression of material facts or fraudulent concealment arising out of any act, occurrence or transaction actionable under the Alabama Deceptive Trade Practices Act.

251.    At all relevant times, Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and the members of the Alabama Subclass were natural people who purchased or leased Defendants' Recalled Devices detailed above for personal, family or household use and not for resale.

252.    At all relevant times, Defendants were corporations or some other legal entity.

253.    The Recalled Devices are "goods" as defined by the Alabama deceptive trade Practice Act. *See* Ala. Code § 8-19-3(3).

254.    At all relevant times, Defendants were engaged in Trade or Commerce as defined by the Alabama deceptive trade Practice Act. *See* Ala. Code § 8-19-3(8).

255.    The Alabama Deceptive Trade Practices Act declares that engaging in unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce is unlawful. *See* Ala. Code § 8-19-5.

256.    The Alabama Deceptive Trade Practices Act further that any person who commits an unlawful practice under this chapter and thereby causes monetary damage to a consumer, shall be liable to each consumer for (1) Any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or (2) Up to three times any actual damages. *See* Ala. Code § 8-19-10.

257.    Defendants, by and through their employees, agents, and/or servants, and in connection with its advertising and sale of the Recalled Devices detailed above, knowingly engaged in deceptive and unconscionable acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above.

258.    Defendants knew that their statements were false or that their conduct was unconscionable because there was an absence of meaningful choice on Plaintiff's part.

259.    Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above with the intent that Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members would rely on those deceptive and unfair acts and practices and induce Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members to purchase Defendants' Recalled Devices.

260.    Because the characteristics of Defendants' Recalled Devices were not as represented, and those characteristics are material to a reasonable consumer of the Recalled Devices, the value of the Recalled Devices was less than the value the Recalled Devices would have had if the Recalled Devices had actually possessed the characteristics that were represented.

261.    Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members were deceived by Defendants' deceptive and unfair acts and practices in that had they known the truth they would not have purchased or leased Defendants' Recalled Devices.

262.    Instead, as a result of Defendants' misrepresentations and/or omissions, Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and the Class members suffered monetary losses in that (1) the actual value of the Recalled Devices they received was less than the value of the Recalled Devices as represented, denying them of the benefit of their bargain; and (2) Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members paid more than the fair market value of the Recalled Devices they received, causing them out-of-pocket damages.

263.    Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members could not have avoided these injuries. Because Defendants were

the sole source of material information that Defendants failed to disclose, Plaintiffs Brengle,

Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy, and Alabama Subclass members

could not have had reason to anticipate the impending harm and thus avoided their injuries.

264.    Plaintiffs Brengle, Brown, Byrge, de Journette, Gilder, Kizzire, and C. McElroy

provided Defendants with pre-suit notice pursuant to Ala. Code § 8-19-10(e) by sending a

certified letter, return receipt requested, containing the basis of Plaintiffs' claims on September

28, 2021.

**ELEVENTH CLAIM FOR RELIEF**

**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 501.201 *et seq.***
**(On behalf of Plaintiffs Bari, Carrion, L. Hudson, R. Hudson,**
**P. McElroy, and Paraday, and the Florida Subclass)**

265.    Plaintiffs Bari, Carrion, L. Hudson, R. Hudson, P. McElroy, and Paraday

incorporate the foregoing allegations as if fully set forth herein.

266.    Plaintiffs Bari, Carrion, L. Hudson, R. Hudson, P. McElroy, and Paraday, and the

Florida Subclass members are "consumers," as defined by Fla. Stat. § 501.203(7), the products

sold by Philips are "goods" within the meaning of the Florida Deceptive and Unfair Trade

Practices Act ("FDUTPA"), and the transactions at issue constitute "trade or commerce" as

defined by FDUTPA.

267.    The FDUTPA, Fla. Stat. § 501.204. provides that "[u]nfair methods of

competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

conduct of any trade or commerce are hereby declared unlawful."

268.    For the reasons discussed herein, Philips violated and continues to violate

FDUTPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices

proscribed by Fla. Stat. § 501.201, et seq. Philips' acts and practices, including its material

49

omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

269.    At all times mentioned herein, Philips engaged in trade or commerce in Florida, as defined by Fla. Stat. § 501.203(8), in that they advertised, offered for sale, sold or distributed goods or services in Florida and/or engaged in trade or commerce directly or indirectly affecting the people of Florida.

270.    Philips repeatedly advertised, both on the labels for the Recalled Devices, on its websites, and through national advertising campaigns, among other items, that the Recalled Devices were and are safe for use by individuals when in fact they contain an unsafe material, PE-PUR Foam, which could cause a Recalled Device user to suffer adverse health effects from use of the Recalled Devices.

271.    Philips' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to the Recalled Devices without being aware that the Recalled Devices contained an unsafe material that could cause adverse health effects. As a direct and proximate result of Philips' unfair and deceptive acts or practices, Plaintiffs Bari, Carrion, L. Hudson, R. Hudson, P. McElroy, and Paraday, and the Florida Subclass suffered damages by purchasing the Recalled Devices because they would not have purchased or leased the Recalled Devices had they known the truth, and they received a product that was worthless because it contains unsafe PE-PUR Foam.

272.    Philips' deceptive trade practices caused injury in fact and actual damages to Plaintiffs Bari, Carrion, L. Hudson, R. Hudson, P. McElroy, and Paraday, and the Florida Subclass in the form of the loss or diminishment of value of the Recalled Devices, which allowed Defendants to profit at the expense of Plaintiffs Bari, Carrion, McElroy, and Paraday and

the Florida Subclass. The injuries to Plaintiffs Bari, Carrion, L. Hudson, R. Hudson, P. McElroy, and Paraday, and the Florida Subclass were to legally protected interests. The gravity of the harm of Philips' actions is significant and there is no corresponding benefit to consumers of such conduct.

273.    Plaintiffs Bari, Carrion, L. Hudson, R. Hudson, P. McElroy, and Paraday, and the Florida Subclass seek relief for the injuries they have suffered as a result of Philips' unfair and deceptive acts and practices, as provided by Fla. Stat. § 501.211 and applicable law.

<u>**TWELFTH CLAIM FOR RELIEF**</u>

**North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. § 75-1.1, *et seq*.**
**(On Behalf of Plaintiff Jeffrey Bartalo and the North Carolina Subclass)**

274.    Plaintiff Bartalo incorporates by reference all preceding paragraphs.

275.    Plaintiff Bartalo this cause of action individually and on behalf of the members of the North Carolina Subclass.

276.    The North Carolina Unfair and Deceptive Trade Practices Act makes it unlawful to engage in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1, *et seq.*

277.    Defendants engaged in unlawful methods of competition and unfair or deceptive acts or practices in or affecting commerce, with respect to the sale and advertisement of the Recalled Products purchased or leased by Plaintiff Bartalo and North Carolina Subclass members, in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*, including by concealing the true risks of the Recalled Products.

278.    The above unfair or deceptive acts or practices by Defendants were conducted in or affecting "commerce."

279.    The above unfair and deceptive acts or practices by Defendants were immoral, unethical, oppressive, and unscrupulous.

280.    The above unfair and deceptive acts or practices by Defendants were reasonably calculated to deceive class members and other consumers, and made with the intent to deceive.

281.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Bartalo and the North Carolina Subclass members.

282.    Plaintiff Bartalo and North Carolina Subclass members justifiably relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

283.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Bartalo and North Carolina Subclass members suffered an ascertainable loss of money or property, real or personal, as described above.

284.    Plaintiff Bartalo and North Carolina Subclass members seek relief under N.C. Gen. Stat. § 75-1.1, *et seq.*, including, but not limited to injunctive relief, damages, treble damages, and attorneys' fees and costs.

## THIRTEENTH CLAIM FOR RELIEF

**Tennessee Consumer Protection Act**
**Tenn. Code Ann. §§ 47-18-101, *et seq.***
**(On Behalf of Plaintiffs Cote and Yates and the Tennessee Subclass)**

285.    Plaintiffs Cote and Yates incorporate by reference all preceding paragraphs.

286.    Plaintiffs Cote and Yates bring this cause of action individually and on behalf of the members of the Tennessee Subclass.

287.    The Tennessee Consumer Protection Act ("TNCPA") was enacted to "protect consumers…from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within [Tennessee]." Tenn. Code Ann. § 47-18-102(2).

288.    The TNCPA makes unlawful, among other things, "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have" and "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." Tenn. Code Ann. § 47-18-104.

289.    Defendants engaged in unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact, with respect to the sale and advertisement of the Recalled Products purchased or leased by Plaintiffs Cote and Yates, and Tennessee Subclass members, in violation of Tenn. Code Ann. §§ 47-18-101, *et seq*., including by making statements or representations that were false or misleading regarding the quality of the Recalled Products and concealing the true risks of the Recalled Products.

290.    Defendants intended that other persons rely on the above unfair and deceptive practices and acts by Defendants were material misrepresentations of a presently existing or past fact, and their reliance was reasonable.

291.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

292.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs Cote and Yates, and the Tennessee Subclass members.

293.    Plaintiffs Cote and Yates, and Tennessee Subclass members justifiably relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Recalled Products had they known that the Recalled Products were defective.

294.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs Cote and Yates, and Tennessee Subclass members suffered an ascertainable loss of money or property, real or personal, as described above.

295.    Plaintiffs Cote and Yates, and Tennessee Subclass members seek relief under Tenn. Code § 47-18-108-109, including, but not limited to injunctive relief, compensatory damages, statutory damages, punitive damages, statutory damages, civil penalties and attorneys' fees and costs.

## FOURTEENTH CLAIM FOR RELIEF

**Texas Deceptive Trade Practices-Consumer Protection Act**
**Tex. Bus. Code § 17.41, *et seq.***
**(On Behalf of Plaintiff Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood and the Texas Subclass)**

296.    Plaintiffs Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood incorporate by reference all preceding paragraphs.

297.    Plaintiffs Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood bring this cause of action individually and on behalf of the members of the Texas Subclass.

298.    The Texas Deceptive Trade Practices-Consumer Protection Act prohibits "[f]alse, misleading, or deceptive acts and practices in the conduct of any trade or commerce." Tex. Bus. Code § 17.46.

299.    Plaintiffs Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood, and Texas Subclass Members, and Defendants were "persons" within the meaning of the Texas Deceptive Trade Practices-Consumer Protection Act. Tex. Bus. Code. § 17.45(3).

54

300.    Defendants participated in unfair, deceptive, or unconscionable acts and practices in the conduct of trade or commence that violated the Texas Deceptive Trade Practices-Consumer Protection Act as described below and alleged throughout the Complaint. By misrepresenting the true quality and concealing the true risks of the Recalled Products, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the advertisement and sale of the Recalled Products purchased by Plaintiffs and the Texas Subclass Members. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Products in the course of their business.

301.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Products.

302.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or commerce, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

303.    Defendants knew that the risks inherent in the Recalled Products made them not suitable for their intended use.

304.    Defendants knew or should have known that their conduct violated the Texas Deceptive Trade Practices-Consumer Protection Act.

305.    Defendants' actions were immoral, unethical, oppressive, and unscrupulous.

306.    Defendants' actions were negligent, knowing, and willful, wanton, and/or reckless with respect to the rights of Plaintiffs and the Texas Subclass Members.

307.   Plaintiff Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood, and the Texas Subclass members justifiably relied on Defendants' representations and omissions about the Recalled Products.

308.   Had Plaintiff Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood, and the Texas Subclass members known the truth about the Recalled Products, they would not have purchased or leased the Recalled Products. Plaintiff and the Texas Subclass members did not receive the benefit of their bargain as a result of Defendants' misconduct.

309.   Defendants owed Plaintiff Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood, and the Texas Subclass members a duty to disclose the truth about the Recalled Products because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Products; (b) intentionally concealed the foregoing from Plaintiff and the Texas Subclass members; and/or (c) made incomplete representations regarding the Recalled Products, while purposefully withholding material facts from Plaintiff Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood, and the Texas Subclass members that contradicted these representations.

310.   As a direct and proximate result of Defendants' unfair, deceptive, and unconscionable acts and trade practices, Plaintiff Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood, and the Texas Subclass members suffered monetary damages as a result of Defendants' conduct.

311.   Defendants' violations present a continuing risk to Plaintiff Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood, and the Texas Subclass members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

312.   Plaintiff Claunch, Rendon, Taylor, Tyra, C. Wood, and D. Wood, and the Texas Subclass members seek relief under Tex. Bus. Code § 17.45, *et seq.*, including, but not limited to

injunctive relief, compensatory damages, statutory damages, punitive damages, statutory damages, civil penalties and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Philips as to each and every count, including:

A.    An order certifying this action and the Nationwide Class and State Subclasses requested herein as a class action, designating Plaintiffs as representatives of the Nationwide Class and State Subclasses, and appointing Plaintiffs' counsel as counsel to the Nationwide Class and State Subclasses;

B.    An order declaring that Philips' actions constitute: (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) fraudulent misrepresentation; (iv) fraud by omission; (v) negligent misrepresentation; and (vi) unfair and deceptive business practices in violation of aforesaid state laws and statutes, and that Philips is liable to Plaintiffs and the Nationwide Class and State Subclasses, as described herein, for damages arising therefrom;

C.    A judgment awarding Plaintiffs and members of the Nationwide Class and State Subclasses all appropriate damages in an amount to be determined at trial;

D.    A judgment awarding Plaintiffs and the Nationwide Class and State Subclasses medical monitoring damages;

E.    A judgment awarding Plaintiffs and the Nationwide Class and State Subclasses prejudgment and post-judgment interest, as permitted by law;

F.    A judgment awarding Plaintiffs and the Nationwide Class and State Subclasses costs and fees, including attorneys' fees, as permitted by law; and

H.     Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

DATED:   September 29, 2021                      Respectfully submitted,

**LEVIN SEDRAN BERMAN LLP**

   */s/ Arnold Levin*
Arnold Levin (PA Bar #02280)
Sandra L. Duggan (PA Bar #56420)
(*pro hac vice forthcoming*)
Laurence S. Berman (PA Bar #26965)
Frederick S. Longer (PA Bar #46653)
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com
sduggan@lfsblaw.com
lberman@lfsblaw.com
flonger@lfsblaw.com

**SHIVER HAMILTON, LLC**

Kyle G.A. Wallace
Georgia Bar No. 734167
*Pro Hac Vice Application Forthcoming*

3490 Piedmont Road, Suite 640
Atlanta, Georgia 30305
Telephone: (404) 593-0020
Facsimile: (888) 501-9536
jeff@shiverhamilton.com
kwallace@shiverhamilton.com